UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JIMMY LEE NAVE JR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-02061-TWP-CSW |
| | ) |
| WEXFORD HEALTH OF INDIANA LLC, | ) |
| SAMUEL J. BYRD, | ) |
| CENTURION HEALTH OF INDIANA, LLC, | ) |
| BOLAJI OJO, | ) |
| CHRISTINA NUDI, | ) |
| CHARLES ELOMBA, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Wexford Health of Indiana, LLC ("Wexford"), Samuel J. Byrd ("Dr. Byrd"), Centurion Health of Indiana, LLC ("Centurion"), Bolaji Ojo ("NP Ojo"), Christina Nudi ("NP Nudi"), and Charles Elomba ("NP Elomba") (Dkt. 64). Plaintiff Jimmy Lee Nave, Jr. ("Mr. Nave"), an Indiana Department of Corrections (IDOC) inmate, filed this action alleging deliberate indifference to his painful, arthritic shoulder, and a *Monell* claim that Wexford and Centurion maintained a policy, custom, or practice during that time of deliberately providing inmates with substandard care to increase profits. For the reasons below, specifically a lack of admissible evidence that any Defendants acted with deliberate indifference, summary judgment is **granted.**

I. **LEGAL STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment,

1

the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.   FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Nave and draws all reasonable inferences in Mr. Nave's favor. *Khungar*, 985 F.3d at 572–73.

NP Ojo, NP Nudi, and NP Elomba are Nurse Practitioners who during the relevant time period treated prisoners within the IDOC. In December 2020, Mr. Nave was incarcerated at Wabash Valley Correctional Facility ("Wabash Valley"). On December 14, 2020—after putting in a healthcare request complaining of pain in his upper right arm and shoulder— Mr. Nave was seen

by Kayla M. McDonald, RN (Nurse McDonald) (Dkt. 65-2 at 1). Nurse McDonald advised Mr. Nave to avoid doing push-ups, rest, stretch the area, and use ice and/or warm compresses. *Id.* at 2. Nurse McDonald's advice did not help Mr. Nave's shoulder and arm pain. *Id.* at 4.

On January 1, 2021, Mr. Nave was seen by Nurse Dana Lantrip ("Nurse Lantrip"). *Id.* Although no additional treatment was prescribed, Nurse Lantrip requested that Mr. Nave's shoulder be x-rayed. *Id.* at 5–6. The x-ray was taken on January 8, 2021. *Id.* Radiologist Dr. Daniel Altma ("Dr. Altma") later interpreted the x-ray and noted "12 mm osseous density at the inferior distal clavicle. This could represent a loose body or other soft tissue ossification." *Id.* at 7. Dr. Byrd believed the "loose body" possibility was "an incidental finding and related to an old injury of soft tissue most likely." *Id.* at 9.

On January 21, 2021, Mr. Nave was seen by Dr. Byrd about his shoulder pain. *Id.* at 8. Mr. Nave informed Dr. Byrd that prior recommendations to apply ice and compresses and take over the counter (OTC) medications from the commissary, were not providing relief. *Id.* After examining Mr. Nave and reviewing the x-ray, Dr. Byrd suspected Mr. Nave had bursitis and tendonitis from exercise overuse. *Id.* at 9. Dr. Byrd prescribed a two-week course of prednisone for Mr. Nave in addition to prior recommendations such as ice and rest. *Id.* at 10.

Mr. Nave did not submit another healthcare request about his shoulder until a year later, January 21, 2022. *Id.* at 11. He was seen by Nurse Theresa Auler ("Nurse Auler") on January 24, 2022. *Id.* at 12. Mr. Nave related that, based on the January 2021 x-ray, he believed he had a loose body of some kind in his shoulder and wanted surgery to have it removed. *Id.* at 13. Nurse Auler referred him to a physician for further evaluation. *Id.*

On February 10, 2022, Mr. Nave visited Dr. Byrd. *Id.* at 16. Dr. Byrd still believed Mr. Nave had bursitis and not a loose body in his shoulder. *Id.* at 17. He prescribed Mobic as a daily

3

pain medication for Mr. Nave until he could receive a subacromial bursa injection of medication into his shoulder. *Id.*

Mr. Nave submitted another healthcare request on March 28, 2022, complaining of persistent pain. *Id.* at 19. He was seen by Dr. Byrd on April 5, 2022, also complaining of newly developed right elbow pain. *Id.* at 20. Dr. Byrd confirmed that the medication injection was scheduled for the near future, discontinued the Mobic prescription, and re-prescribed a seven-day course of prednisone. *Id.* at 22. He also ordered a new set of x-rays. *Id.*

On April 8, 2022, Dr. Byrd performed the shoulder medication injection, which consisted of forty milligrams of methylprednisolone. *Id.* at 24. A new set of x-rays also was taken that day, which Dr. Altman identified as showing the possibility of "degenerative change or remote injury." *Id.* at 25. After Dr. Byrd reviewed the x-ray results, he prescribed Mr. Nave Voltaren, which is an anti-inflammatory topical gel specifically used to treat arthritis and joint degeneration. *Id.* at 27; Dkt. 65-1 ¶ 13. Dr. Byrd also noted that he could not feel a loose body in Mr. Nave's shoulder and did not believe that it would be the cause of his pain (Dkt. 65-2 at 27; Dkt. 65-1 ¶ 12).

On June 15, 2022, Mr. Nave was seen by Nurse Lesa Wolfe ("Nurse Wolfe") about his continued shoulder pain (Dkt. 65-2 at 28). Nurse Wolfe advised him to purchase OTC anti-inflammatories from the commissary. *Id.* at 29. On July 14, 2022, Mr. Nave was seen by Nurse Theresa Bradley about his continued shoulder pain. *Id.* at 31. Based on the nursing report, Dr. Byrd ordered another seven-day course of prednisone and Mr. Nave was scheduled for another medication injection, which took place on July 29, 2022. *Id.* at 35, 37.

On August 9, 2022, Mr. Nave was seen by Nurse Wolfe because of his continued shoulder pain. *Id.* at 38. Nurse Wolfe advised Mr. Nave to give the Voltaren and other medications more time to work. *Id.* at 40. He was also again prescribed prednisone on this date. *Id.*

4

Sometime after this visit, Mr. Nave was transferred to Plainfield Correctional Facility ("Plainfield"). On September 6, 2022, he had a nursing intake visit with Nurse John Barksdale, where his Voltaren prescription was noted (Dkt. 65-3 at 1).

On October 5, 2022, Mr. Nave was seen by Nurse Kalyn Corrice about this shoulder pain. *Id.* at 7. She referred him for further evaluation. *Id.* at 8.

On October 13, 2022, Mr. Nave was seen by NP Ojo. *Id.* at 9. NP Ojo advised that Mr. Nave undergo some lifestyle changes, including weight loss, exercise, and dietary changes. *Id.* at 11. NP Ojo also prescribed a new pain medication—Trileptal—and referred Mr. Nave to physical therapy. *Id.* However, for reasons that are unclear, Mr. Nave did not appear for the physical therapy referral appointment scheduled for November 10, 2022, but there is no evidence it was the fault of any of the Defendants. *Id.* at 12.

Mr. Nave filed this lawsuit on October 21, 2022, against Dr. Byrd and Wexford, alleging ineffective treatment of his shoulder pain (Dkt. 2). The Court screened Mr. Nave's Complaint and allowed an Eighth Amendment deliberate indifference claim to proceed against Dr. Byrd and a deliberate indifference claim due to policy or custom to proceed against Wexford under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), though the Court noted that Centurion had taken over the provision of healthcare at IDOC facilities in July 2021 (Dkt. 9 at 2, 4–5).

Mr. Nave was next seen by NP Ojo about his shoulder on February 2, 2023 (Dkt. 65-3 at 13). At this visit, Mr. Nave stated that he learned of his family history of rheumatoid arthritis ("RA"). *Id.* NP Bolaji ordered testing to confirm whether Mr. Nave has RA and ordered an ultrasound of his shoulder. *Id.* at 14. The ultrasound was reviewed by Dr. Robert Mehl, who found no abnormalities. *Id.* at 16. It also appears that Mr. Nave again was referred to physical therapy, but again there is no record of Mr. Nave going to physical therapy. *Id.* at 14.; Dkt. 69 at 8 ¶ 43.

On February 23, 2023, Mr. Nave followed up with NP Ojo and indicated that none of the medications or treatments thus far were providing relief for his shoulder pain. *Id.* at 17. The notes from this date state in part that Mr. Nave does have RA and "Rheumatoid factor elevated." *Id.* at 19. Mr. Nave was continued on the prednisone and ibuprofen. *Id.* NP Ojo also ordered another round of x-rays. *Id.* at 20.

On March 31, 2023, Mr. Nave was seen by NP Nudi. *Id.* at 23. NP Nudi discussed starting a new drug with Mr. Nave, methotrexate,[1] and she ordered lab work that needed to be done to check baseline levels before he could start taking the drug. *Id.* at 24. That same day, NP Nudi emailed Centurion's Associate Statewide Medical Director, Dr. Kate Wilks ("Dr. Wilks"), for advice on whether to begin methotrexate for Mr. Nave (Dkt. 69 at 36). Dr. Wilks agreed with starting Mr. Nave on methotrexate and advised him to begin with a dose of seven and one-half milligrams weekly and advised on additional lab work that needed to be done before he could begin taking it. *Id.*

On April 6, 2023, Mr. Nave saw NP Elomba (Dkt. 65-3 at 26). NP Elomba reviewed the latest x-rays with Mr. Nave, which did not reveal any new information. *Id.* In addition to ordering more lab work related to starting methotrexate, NP Elomba also ordered a naproxen sodium prescription for Mr. Nave. *Id.* at 28. Also, on April 14, 2023, NP Nudi ordered still more lab work that needed to be done before Mr. Nave could begin taking methotrexate. *Id.* at 29.

On May 31, 2023, Mr. Nave saw NP Elomba, at which time Mr. Nave's prescription for seven and one-half milligrams methotrexate was started, plus folic acid. *Id.* at 31, 33. NP Elomba

---

[1] "Methotrexate is a folic acid antagonist indicated for the treatment of rheumatoid arthritis because of its high potency and efficacy." https://www.ncbi.nlm.nih.gov/books/NBK556114/ (last visited Feb. 13, 2025). Methotrexate can not only help alleviate RA symptoms, but also reduce joint damage (Dkt. 69 at 100).

6

advised Mr. Nave that it might take six to twelve weeks for the methotrexate to begin working. *Id.* at 33.

On June 13, 2023, Mr. Nave filed an Amended Complaint in this case, adding Centurion, NP Ojo, NP Nudi, and NP Elomba as defendants (Dkt. 22). The Court screened the Amended Complaint and allowed deliberate indifference claims to proceed against NP Ojo, NP Nudi, and NP Elomba and a *Monell* claim to proceed against Centurion (Dkt. 27).

On June 29, 2023, Mr. Nave had another visit with NP Elomba (Dkt. 65-3 at 35). NP Elomba doubled the methotrexate dosage to fifteen milligrams and directed Mr. Nave to follow up in three months. *Id.* at 37. On November 20, 2023, Mr. Nave was seen by Syrus Anderson, RN ("Nurse Anderson") about his continued severe shoulder pain. *Id.* at 39. Nurse Anderson provided education and advice about icing, heating, and/or immobilizing the arm. *Id.* at 41. Also, Mr. Nave was referred for further evaluation. *Id.*

On December 2, 2023, Mr. Nave was seen by NP Ojo. *Id.* at 42. Mr. Nave "refused pain medication besides methotrexate." *Id.* NP Ojo provided advice on the need to exercise the shoulder and for lifestyle modifications, and recommended that Mr. Nave follow up in three months. *Id.* at 44. No other changes in care were provided and there were no tests ordered. *Id.*

On January 10, 2024, Mr. Nave submitted a healthcare request form stating, "I'm still having pain in my right shoulder and for the past month my meds have not been in. Plus the meds are ineffective. I would like to try a new medication to see if it helps." (Dkt. 69 at 40). The response to this request states, "Duplication of Request. Seen for the Request." *Id.* It is unknown who wrote this response. As of July 24, 2024, Mr. Nave had not seen any medical providers about his shoulder since the December 2, 2023 visit with NP Ojo. *Id.* at 10. There also is no evidence that Mr. Nave submitted another healthcare request after January 10, 2024.

7

Dr. Byrd submitted an Affidavit in Support of Summary Judgment, discussing the course of treatment he provided to Mr. Nave while he was at Wabash Valley (Dkt. 65-1). Dr. Byrd affirms that because of Mr. Nave's transfer to Plainfield, he did not have "a reasonable opportunity to judge the effectiveness of the current treatment or determine whether further elevation of treatment was medically indicated." *Id.* at ¶ 18. "However, the treatment I was able to provide was reasonable, appropriate, and based upon my professional judgment as an experienced primary care physician with due regard for my patient and his medical presentation." *Id.* at ¶ 19.

Dr. Byrd's Affidavit is consistent with his interrogatory responses given to Mr. Nave during discovery, including that he did not believe a referral to an outside specialist or for an MRI were warranted (*see* Dkt. 69 at 109). Additionally, NP Nudi's interrogatory responses stated in part, based on her professional judgment, that "[a]t no point during my treatment of Mr. Nave was [a rheumatologist] consult medically indicated or necessary." *Id.* at 118. She also stated that in her professional opinion, neither an MRI nor surgery had been necessary to treat Mr. Nave. *Id.* at 120, 125. Mr. Nave has not submitted any expert opinions contrary to Dr. Byrd's or NP Nudi's.

In his declaration, Mr. Nave disputes several facts asserted by Defendants, including some that are reflected in the medical records. He affirms that he repeatedly requested an MRI for his shoulder, which Dr. Byrd, NP Ojo, and NP Nudi, and NP Elomba indicated would not be approved (Dkt. 69 at 5 ¶ 10, 7 ¶ 40, 9 ¶ 54, 9 ¶ 56). He alternatively requested surgery for his shoulder, which also was denied. *Id.* at 9 ¶ 54, 10 ¶ 72. Overall, he asserts that the medical records minimize the extent to which he repeatedly complained of his pain, requested alternative treatments, and/or expressed dissatisfaction with the treatments that were being provided (*see* Dkt. 68 at 2–8). He also asserts that both Wexford's and Centurion's Technical Proposals to the State of Indiana, bidding to provide healthcare services at IDOC facilities, evidence both companies' inclination to

8

prioritize cost savings over patient well-being (*see* Dkt. 69 at 42–94). Finally, Mr. Nave has submitted an excerpt from a medical treatise discussing bursitis, RA, and treatments for them. *Id.* at 96–100 (Merck Manual of Medical Information – Second Home Edition 2003, pp. 417-418, 370-375).

### III. DISCUSSION

The Court will first address Mr. Nave's Eighth Amendment claim against the individual Defendants, before turning to his *Monell* claim against Wexford and Centurion.

Considering the evidence in the light most favorable to Mr. Nave, the Court accepts that he repeatedly requested an MRI for his shoulder, and alternatively requested surgery for his shoulder, which was denied. The Court also accepts that the medical records minimize the extent to which he repeatedly complained of his pain, requested alternative treatments, and/or expressed dissatisfaction with the treatments that were being provided. In addition, the Court assumes for purposes of the summary judgment motion that Mr. Nave's persistent severe shoulder pain was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that NP Ojo, NP Nudi, and NP Elomba and Dr. Byrd acted with deliberate indifference— that is, that they "consciously disregarded a serious risk to [Mr. Nave's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (citation omitted).

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate

9

indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Nave "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

The record is undisputed that the various individual Defendants in this case repeatedly tried to assess and treat Mr. Nave's severe shoulder pain—employing a variety of medications and tests. The record viewed in a light most favorable to Mr. Nave also shows that the attempted treatments were ineffective and that he repeatedly made Defendants aware of that ineffectiveness and

10

requested different tests and/or treatments. Mr. Nave, therefore, frames his claim as Defendants persisting in a course, or courses of treatment known to be ineffective.

The medical records show, and Mr. Nave does not dispute his diagnosis of Rheumatoid Arthritis. Unfortunately, some ailments are difficult to treat effectively, and that seems to be the case with Mr. Nave's shoulder.[2] "It is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment. The challenged plan must deviate so substantially from accepted professional judgment that no reasonable physician would reach the same judgment." *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (citations omitted). Generally, to avoid summary judgment on a deliberate indifference claim where the movant has designated uncontradicted expert evidence indicating that a course of treatment was medically acceptable, a plaintiff must "offer expert testimony or other comparable evidence on that contention." *Jacob v. Field*, No. 24-1426, 2025 WL 64011 at *2 (7th Cir. Jan. 10, 2025) (citing *White v. Woods*, 48 F.4th 853, 862 n.4 (7th Cir. 2022)). "Although such evidence 'is not always essential for an Eighth Amendment deliberate indifference claim based on medical treatment (or lack thereof), most such claims require us to take a peek at the physician's judgment, to ensure that he was actually exercising medical judgment and was not otherwise deliberately indifferent.'" *White*, 48 F.4th at 863 n.4 (quoting *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019)).

On occasion, a plaintiff may survive summary judgment on claims such as Mr. Nave's, despite a lack of contrary expert evidence, but such cases are relatively rare. "Such evidence can include standard treatment protocols, which can support an inference that the doctor 'knew better'

---

[2] The medical treatise Mr. Nave submitted to the Court states about RA, "Treatment alleviates symptoms in [three] of [four] people." (Dkt. 69 at 99). It is possible Mr. Nave may be in the unfortunate twenty-five percent of RA sufferers whose symptoms are very difficult to alleviate.

11

than to pursue the course of treatment that he did." *Wilson*, 932 F.3d at 520 (quoting *Whiting*, 839 F.3d at 663). In *Wilson*, the plaintiff presented evidence that his physician ignored the possibility that the plaintiff had a hernia and the physician's refusal to provide appropriate treatment for a hernia "would have contradicted his own medical judgment about appropriate basic treatment for hernias." *Id.* Here, there is no evidence in the record that would support a finding that any Defendant ignored or contradicted what their treatment plan would have been for Mr. Nave.

Or, for example, in *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), the plaintiff suffered from severe stomach pains for approximately two and one-half years before he was referred to a specialist, diagnosed with an esophageal ulcer, and received appropriate treatment for it. There was evidence in that case that a physician suspected an ulcer early on, and noted the need for testing to rule out the possibility, but testing was not done for nearly eighteen months. *Id.* at 654-55. There also was evidence that a nurse gave the plaintiff a painkiller that was specifically contraindicated for persons with ulcers and that a doctor later effectively banned the plaintiff from receiving any treatment for several months. *Id.* Here, unlike in *Greeno*, there is no evidence of Mr. Nave ultimately receiving a treatment that should have been provided much earlier, nor that any medical provider believed another diagnosis, treatment, or test was necessary at an earlier time. There also is no evidence of Mr. Nave receiving blatantly contraindicated treatment for his shoulder pain or that he was prevented from seeking additional treatment at any time.

By contrast, in *Pyles v. Fahim*, 771 F.3d 403 (7th Cir. 2014), the plaintiff injured his back in a fall and had prolonged severe pain thereafter. In over a year of providing various treatments, pain medications, and x-rays for the plaintiff, the defendant physician also declined to order an MRI for the plaintiff or to refer him to a specialist despite plaintiff's complaints that the course of treatment was not working and the pain was increasing. *Id.* at 407-08. The Seventh Circuit affirmed

a grant of summary judgment in favor of the physician on the plaintiff's deliberate indifference claim. *Id.* at 411–12. The court held that the need to refer the plaintiff to specialist was not "obvious," unlike a situation in which a physician refuses to refer a patient complaining of tooth pain to a dentist. *Id.* at 412 (citing *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)). Nor was the case like *Greeno*, because there was no prior indication of a serious long-term medical issue. *Id.* There also was no deliberate indifference in refusing to schedule an MRI; "[a]n MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Id.* at 411 (quoting *Estelle,* 429 U.S. at 107).

The Court does not doubt Mr. Nave's assertion that he has had and continues to suffer from severe pain, that the treatments ordered or approved by the Defendants thus far have not relieved him of that pain, and that Defendants have been aware of that lack of relief. The Court might even agree that referring Mr. Nave to a rheumatologist would be optimal, but the Court can only speculate to that effect. It does not have before it any expert testimony contradicting Dr. Byrd's and NP Nudi's statements that, in their professional opinions, the care they provided was appropriate, a referral was not warranted, and the treatments and tests they ordered were not outside the range of acceptable medical judgment. This is also not a situation in which it would be readily apparent to a layperson that referral to an outside specialist, or a different course of treatment, would be mandated. Although Mr. Nave's *pro se* status and lack of legal skills in conducting discovery may have resulted in him being unable to designate competing expert testimony in this case, it does not alleviate his burden on summary judgment. *See Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011). Mr. Nave's citation to the medical treatise he provided to the Court, while it may provide helpful background to his claims, does not create a question of fact as to the medical care he personally received and whether it constituted deliberate indifference.

Ultimately, the question is not whether the treatments provided to Mr. Nave thus far have been ineffective, but whether they show deliberate indifference to Mr. Nave's pain. The designated evidence fails to show deliberate indifference.[3] *See, e.g.*, *id.* at 411–12; *Jacob*, 2025 WL 64011 at *2 (affirming summary judgment in favor of physician where pro se plaintiff failed to present any expert testimony indicating that physician's alleged three-year delay in adequately treating plaintiff's hypertension "departed at all, let alone substantially, from acceptable medical judgment."); *Riley v. Waterman*, 126 F.4th 1287, 1296 (7th Cir. 2025) (holding medical defendants were entitled to summary judgment, despite evidence they may not have followed specialist's treatment recommendations for plaintiff's plantar fasciitis, emphasizing that "an overarching consideration in assessing a deliberate indifference claim is an examination of the totality of circumstances of the patient's care."). For these reasons, after reviewing the totality of the circumstances of Mr. Nave's care, the individual Defendants are entitled to judgment as a matter of law. They did not "persist" in any one course of treatment but attempted to alleviate Mr. Nave's symptoms through a changing and evolving course of treatment. Accordingly, summary judgment is **granted** on the Eighth Amendment claim.

Mr. Nave has also failed to support his *Monell* claim against Wexford or Centurion. He offers no evidence or authority to support his assertions that the companies' alleged proposals to use telehealth and other measures to provide inmates appropriate care while remaining mindful of taxpayer cost and the public safety risks attendant to off-site transportation of inmates, is unconstitutional. Moreover, in the absence of any underlying constitutional violation, Wexford

---

[3] Additionally, the Court notes that to the extent Mr. Nave's January 2024 request for additional treatment went ignored until at least of July 2024, and that he was twice referred to physical therapy but apparently never received it, there is nothing to indicate that any of the Defendants were responsible for these failures. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* These issues are not a sufficient basis for imposing liability against the Defendants.

and Centurion cannot be held liable for damages under *Monell*. *See Pyles*, 771 F.3d at 412 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)) (stating "Wexford cannot be held liable for damages because there is no underlying constitutional violation."). Accordingly, summary judgment is **granted** on Mr. Nave's *Monell* claim.

### IV. <u>CONCLUSION</u>

The Court has empathy for Mr. Nave and the pain he experiences because of his Rheumatoid arthritis. But the record fails to show there are any genuine issues of material fact as to whether the Defendants were deliberately indifferent to Mr. Nave's serious medical needs, or that Wexford or Centurion are liable for damages under a *Monell* claim. For the reasons explained above, Defendants' Motion for Summary Judgment, Dkt. [64], is **GRANTED**.

This case is **dismissed with prejudice** and final judgment consistent with this Order will issue in a separate filing.

**IT IS SO ORDERED.**

Date: 3/5/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

JIMMY LEE NAVE JR
232904
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only